# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PECO LOGISTICS, LLC,            )
                                        )
        Plaintiff/Counterclaim       )
        Defendant,                  )
                                          )
      v.                         )     C.A. No. 9978-CB
                                          )
WALNUT INVESTMENT PARTNERS, L.P.,  )
and WALNUT PRIVATE EQUITY FUND,    )
L.P.,                                   )
                                          )
        Defendants/Counterclaim     )
        Plaintiffs.               )

## MEMORANDUM OPINION

Date Submitted: October 6, 2015
Date Decided: December 30, 2015

Garrett B. Moritz and Nicholas D. Mozal of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Counsel for Plaintiff/Counterclaim Defendant*.

Bartholomew J. Dalton and Andrew C. Dalton of DALTON & ASSOCIATES, P.A., Wilmington, Delaware; *Counsel for Defendants/Counterclaim Plaintiffs*.

**BOUCHARD, C.**

In March 2011, two sophisticated investors (the "Walnut Investors") acquired preferred units in PECO Logistics, LLC ("PECO" or the "Company") and became parties to an LLC agreement that afforded them the voluntary right to sell their preferred units back to PECO three years later (the "Put Right"). The LLC agreement provides that, upon exercise of the Put Right, the Company must retain a nationally recognized valuation firm to determine the fair market value of the preferred units in accordance with a specified formula, and that the Company must repurchase the preferred units for the determined value. The LLC agreement further provides that both the Company and the investors "shall be bound by the determination" of the valuation firm.

In May 2014, after the Walnut Investors exercised the Put Right, PECO's board engaged Duff & Phelps to perform the valuation required under the LLC agreement. A representative of the Walnut Investors who was on PECO's board at the time participated in the selection of Duff & Phelps, whose independence is unchallenged in this case. After Duff & Phelps made its determination, however, the Walnut Investors refused to transfer their preferred units back to the Company at the determined value. This refusal prompted PECO to file this action seeking declaratory relief that PECO had complied with the terms of the LLC agreement in valuing the preferred units, and that the Walnut Investors are bound by the Duff & Phelps valuation. The Walnut Investors filed a counterclaim in response alleging that PECO had breached the implied covenant of good faith and fair dealing.

The Walnut Investors challenge the substance of several decisions Duff & Phelps made in applying the valuation formula in the LLC agreement, which they claim is

ambiguous in three respects and was construed against them. The Walnut Investors also assert that the parties agreed to modify the LLC agreement to afford them rights they originally did not have because the Walnut Investors unilaterally "reserved their rights" to participate in the valuation process and to object to the determination of value when they exercised the Put Right. The matter is presently before the Court on PECO's motion for judgment on the pleadings to grant its requested declarations and to dismiss the counterclaim for failure to state a claim for relief.

The most significant question before me is what standard of review to apply in evaluating the Walnut Investors' challenges to certain decisions Duff & Phelps made in applying the valuation formula in the LLC agreement. Based on the reasoning in *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*,[1] I conclude that the Court should defer to the judgment calls Duff & Phelps had to make to apply the valuation formula in a sensible manner because the parties here expressly agreed that the valuation firm's determination would be binding without providing any mechanism for review of that determination. I also conclude that the LLC agreement was not modified and that no facts have been alleged to call into question the independence of Duff & Phelps or to suggest that the Company tainted the contractually prescribed valuation process so as to sustain a claim for breach of the implied covenant of good faith and fair dealing. For these reasons and others explained below, the Walnut Investors' counterclaim fails to state a claim for relief and PECO is entitled to the declaratory relief it seeks.

---

[1] 2013 WL 1955012 (Del. Ch. May 13, 2013).

## I.    BACKGROUND[2]

### A.    The Parties

Plaintiff PECO Logistics, LLC is a Delaware limited liability company with its principal executive offices in Irvington, New York. PECO is managed by a seven-person board of managers, which includes Frederic Mayerson, the general partner of the Walnut Investors. PECO's sole asset is its equity interest in PECO Pallet Holdings, Inc. (together with its subsidiaries, "PECO Pallet"), a provider of pallet rental services. PECO Pallet rents pallets to manufacturers who use the pallets to ship grocery products and consumer goods to retailers.

Defendants Walnut Investment Partners, L.P. and Walnut Private Equity Fund, L.P. (together, the "Walnut Investors") are Delaware limited partnerships with their principal places of business in Cincinnati, Ohio. As of May 2014, when they both exercised the Put Right, they owned 5,382.84 and 1,287.32 preferred units of PECO, respectively.

---

[2] Unless otherwise noted, the facts recited in this opinion are based on the well-pled facts admitted to be true in the Walnut Investors' Answer to the Verified Amended Complaint (the "Answer") and PECO's Reply to the Verified Counterclaim. *See Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Ch. 1989), *aff'd*, 567 A.2d 419 (Del. 1989) (TABLE). I also consider the unambiguous terms of documents attached to the complaint, including (as defined herein) the LLC Agreement, the Put Notice and the Duff & Phelps report. *See OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1089, 1095 (Del. Ch. 2006) ("The court also may consider the unambiguous terms of exhibits attached to the pleadings . . . .") (granting judgment on the pleadings).

3

## B.     History of PECO Pallet

Formed in the 1990s, PECO Pallet supplies pallets, through pallet pooling arrangements, under which its customers rent pallets based upon their shipping needs. Pallet pooling on a large scale requires significant capital investment, as the pallets must be purchased, paid for in full, and stored to be available for use by PECO Pallet's customers. To meet its increasing capital needs, PECO Pallet sought out buyers for the business.[3]

In March 2011, Jabodon PT Company acquired PECO Pallet. In the acquisition, PECO Pallet merged with and into PECO Merger Sub, Inc., and survived the merger as a wholly owned subsidiary of PECO. As part of this transaction, certain pre-acquisition stockholders of PECO Pallet, including the Walnut Investors (collectively, the "Rollover Investors"), "rolled over" their existing shares into preferred units of PECO and became parties to the PECO Logistics, LLC Limited Liability Company Agreement dated as of March 14, 2011 (the "LLC Agreement").

## C.     The LLC Agreement and the Put Right

The LLC Agreement, which is governed by Delaware law,[4] affords each Rollover Investor a voluntary right to require PECO to purchase all (but not less than all) of their preferred units (the "Put Units") during a window of time commencing on the three-year anniversary of the LLC Agreement:

---

[3] An outside buyer would provide a greater ability to take on debt to help PECO Pallet grow and reach national scale. *See infra* n.55 and accompanying text.

[4] Verified Amended Complaint Ex. 1 (LLC Agreement) § 14.9.

> During the period that is between 30 days and 60 days following March 14, 2014, each Rollover Investor may elect to deliver a written notice . . . to the Company and the Investor of its desire to require the Company (and the Investor as contemplated by Section 9.2(d)) to purchase all (but not less than all) of the Preferred Units held by such Rollover Investor . . . .[5]

As promptly as practicable following receipt of a written notice exercising the Put Right, PECO must engage at its cost "a nationally recognized valuation firm . . . to determine the Fair Market Value of the Put Units as determined by the Valuation Firm in accordance with this Agreement (the 'Put Price') . . . ."[6] "Within 45 days following the Valuation Firm's determination of the Put Price," the Company is required to purchase the preferred units from the Rollover Investors who exercised their Put Right.[7]

The LLC Agreement sets forth a formula the valuation firm must apply. To begin, Section 13.1 defines the "Fair Market Value" of the Put Units as follows:

> . . . solely for purposes of Section 9.2 with respect to the Put Units that are subject to a Put Notice . . . the "Fair Market Value" of the Put Units shall be determined by the Valuation Firm as contemplated by Section 9.2 based on such Put Unit's Pro Rata Share as of the date of valuation. It is agreed and acknowledged that in the determination of Fair Market Value of any Unit there shall be no minority or non-marketability discount applied.

The term "Pro Rata Share" is defined as "the proportionate amount such Unit would receive if an amount equal to the Total Equity Value were distributed to all Units in

---

[5] LLC Agreement § 9.2(a). The term "Investor" means affiliates of and certain investment funds managed or advised by The Pritzker Group. *Id.* Art. I, at 4.

[6] *Id.* § 9.2(b).

[7] *Id.* 9.2(c). There are certain limited exceptions to the Company's obligation to purchase the Put Units, none of which have been pled to have applied in this case. *See infra* n.26.

5

accordance with the distribution provisions of <u>Section 4.1(b),</u>" which sets forth a waterfall for making distributions to holders of preferred and common units.[8]

The definition of "Total Equity Value" specifies a three-step process for determining the amount of proceeds hypothetically available to distribute to the unitholders:

> <u>"Total Equity Value"</u> means the aggregate proceeds which would be received by the Unitholders if: (i) all of the assets of the Company were sold at their fair market value to an unrelated third-party on arm's-length terms, with neither the seller nor the buyer being under compulsion to buy or sell such assets; (ii) the Company satisfied and paid in full all of its obligations and liabilities (including all Taxes, costs and expenses incurred in connection with such transaction and any amounts reserved by the Board with respect to any contingent or other liabilities); and (iii) such net sale proceeds were then distributed in accordance with the distribution provisions of Section 4.1(b), all as determined by the Board.

For the purpose of calculating the Total Equity Value when the Put Right has been exercised, Section 9.2 provides that the value of the assets (*i.e.*, part (i) of the definition of "Total Equity Value" quoted above) shall be subject to upper and lower limits based on certain earnings multiples calculated as of year-end 2013 (the "EBITDA Collar"):

> solely for purposes of determining the Put Price, clause (i) of the definition of "Total Equity Value" (i) may not be less than the product of (A) 6.5 <u>multiplied by</u> (B) the Company's "EBITDA less Maintenance Capex" for the 12-month period ending on (1) December 31, 2013 with respect to the Rollover Put Units . . . and (ii) may not be more than the product of (A) 7.5 <u>multiplied by</u> (B) the Company's "EBITDA less Maintenance Capex" for the 12-month period ending on (1) December 31, 2013 with respect to the Rollover Put Units . . .

---

[8] The term "Units" includes preferred units and common units of PECO. LLC Agreement Art. I, at 15.

6

To summarize, the valuation methodology in the LLC Agreement when the Put Right has been exercised involves the following steps:

1.      The valuation firm must determine the fair market value of the Company's assets, assuming a sale to an unrelated third party at arm's length.

2.      The valuation firm then applies the EBITDA Collar to ensure that the value of the assets is at least 6.5 times but not more than 7.5 times the Company's "EBITDA less Maintenance Capex" for year-end 2013.[9]

3.      The resulting number is then reduced by the amount of the Company's obligations and liabilities.

4.      The amount remaining after steps 1-3 is run through the waterfall in Section 4.1(b) to determine the amount allocable to each preferred unit.

Critical to the dispute in this case, the last sentence of Section 9.2(b) of the LLC Agreement states that the Company and the Rollover Investors "shall be bound by the determination of the Valuation Firm . . . with respect to the Put Price as established by the Valuation Firm . . . pursuant to this Section 9.2(b) and the terms of this Agreement." The LLC Agreement does not contain any mechanism providing for judicial, arbitral or any other form of review of the valuation firm's determination.

---

[9] The term "EBITDA less Maintenance Capex" is defined as "Consolidated EBITDA plus Pallet Losses minus Maintenance Capital Expenditures." LLC Agreement §9.2(b).

7

### D. The Rollover Investors Exercise the Put Right

On February 13, 2014, PECO provided the Rollover Investors with a ledger showing their respective ownership of preferred units, the Company's 2013 unaudited financials, and a waterfall calculation showing the estimated value of the preferred units the Rollover Investors owned based upon PECO's understanding of the valuation methodology in the LLC Agreement.[10] After receiving this information, Mayerson of the Walnut Investors exchanged e-mails with Thomas Kuczmarski, the Company's Chief Financial Officer, expressing disagreement with the Company's calculation.[11] The Company and the Rollover Investors met numerous times but failed to reach agreement on the value of the preferred units.

Despite failing to reach agreement with the Company on the value of their preferred units, the Rollover Investors proceeded to exercise the Put Right in a letter dated May 5, 2014 (the "Put Notice"). The Put Notice stated, in part, that "[t]he Rollover Investors reserve all rights with respect to the determination of the Fair Market Value of the Put Units, including without limitation the right to participate in the determination, the right to provide information to and confer with the Valuation Firm concerning the determination and the right to object to the Valuation Firm's Determination."[12] I refer to this provision as the "Reservation of Rights."

---

[10] Answer ¶ 30.

[11] *Id.*

[12] Verified Amended Complaint Ex. 2 (Put Notice) 1.

### E. PECO Engages Duff & Phelps

On May 8, 2014, the Company's board of managers met to discuss the Rollover Investors' exercise of the Put Right. The board, including Mayerson, discussed three potential valuation firms. After discussing possible conflicts, the board eliminated one of the candidates. On May 12, 2014, the board further discussed potential conflicts concerning the two remaining firms (one of which was Duff & Phelps) and unanimously authorized the Company's CFO to seek proposals from them and, based on the timing, economics, and other aspects of each proposal, to select one of the firms to conduct a valuation of the Put Units. Mayerson attended this meeting and voted in favor of this proposal.[13] On June 20, 2014, after negotiating the terms of Duff & Phelps' engagement, the board formally approved the Duff & Phelps engagement letter. Mayerson abstained from this vote.

### F. The Duff & Phelps Report

On July 29, 2014, Duff & Phelps presented its valuation report to the PECO board. In its report, Duff & Phelps stated that "[t]he LLC Agreement provides considerable detail regarding valuation procedures and assumptions related to the determination of the Put Price."[14] The Duff & Phelps report went on to explain certain key assumptions it made in performing its valuation, including the following:

---

[13] Answer ¶ 34.

[14] Verified Amended Complaint Ex. 3 (Duff & Phelps Report) 6.

9

- It valued the preferred units as of June 1, 2014, based on the fact that the latest financial information available to Duff & Phelps when it commenced its valuation work was the Company's May 2014 financial information.

- The fair market value of PECO's assets was determined based on the value of its investment in PECO Pallet, its sole asset. Because PECO is a holding company with no operations and no income, the EBITDA Collar was applied "as a limitation of the enterprise value of PECO Pallet (the operating company), before deducting debt to conclude on a value for the equity which is owned by the Company."

- Fair market value was defined by reference to the US Tax Code as "the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts."

- The fair market value of the equity of PECO Pallet was calculated by the combination of an income approach, using the discounted cash flow method, and a market approach, based on market-based multiples of comparable companies and precedent transactions.[15]

Based on the foregoing assumptions and others detailed in its report, Duff & Phelps calculated a total enterprise value for PECO Pallet of approximately $275 million. Because that value exceeded the cap under the EBITDA Collar, Duff & Phelps reduced

---

[15] *Id.* 8-10.

the total enterprise value to approximately $209 million—or 7.5 times the "2013 EBITDA less Maintenance Capex" of $27,949,000. After subtracting approximately $114.4 million of debt, adding back approximately $1 million of cash and cash equivalents, and subtracting hypothetical transaction, legal and accounting fees, Duff & Phelps determined the total equity value available for distribution to the unitholders to be approximately $93.12 million.[16]

At the July 29 board meeting, Mayerson, on behalf of the Rollover Investors, declined to accept the Duff & Phelps report. When asked whether the Rollover Investors would promptly execute documents to transfer their preferred units to the Company at the value set forth in the Duff & Phelps report, Mayerson, on behalf of the Rollover Investors, refused to do so.

### G.  Procedural History

PECO filed a verified complaint on July 30, 2014, and a verified amended complaint on August 1, 2014, asserting two claims for declaratory relief. On October 1, 2014, the Walnut Investors filed an answer to the amended complaint and a counterclaim asserting a single claim for breach of the implied covenant of good faith and fair dealing. On November 7, 2014, PECO moved for an order granting judgment on the pleadings on its two claims for declaratory relief, and dismissing the counterclaim.

---

[16] *Id.* Exs. 2.0 & 3.0.

## II.    LEGAL ANALYSIS

### A.    Legal Standard

Under Court of Chancery Rule 12(c), "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." "In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party."[17] "The court must take the well-pleaded facts alleged in the complaint as admitted," and "[a] motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[18]

Under 10 *Del. C.* § 6501, Delaware courts are authorized to entertain declaratory judgment actions provided that an "actual controversy" exists between the parties.[19] For an "actual controversy" to exist, four prerequisites must be satisfied:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between the parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[20]

---

[17] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[18] *Id.*

[19] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989).

[20] *Id.* at 479-80 (citation omitted).

## B. The Parties' Contentions

In Count I of its amended complaint, PECO seeks a declaration that it fully complied with the terms of the LLC Agreement in valuing the preferred units. In Count II, PECO seeks a declaration that the Walnut Investors are bound by the Duff & Phelps valuation of the preferred units. Taken together, Counts I and II essentially seek a declaration of the validity of the process by which PECO responded to the exercise of the Put Right and Duff & Phelps valued the Walnut Investors' preferred units.

The Walnut Investors do not dispute that an actual controversy exists concerning the process by which their preferred units were valued, nor could they. They have refused to accept the valuation determined in the Duff & Phelps report and to execute customary documents necessary to transfer their preferred units to PECO.[21] They also have filed their own claim challenging the valuation process. The form of that challenge is revealing. The Walnut Investors do not assert that PECO breached any express term of the LLC Agreement. They instead advance essentially two arguments. First, in response to PECO's motion for judgment on the pleadings of its affirmative claims for declaratory relief, the Walnut Investors argue that the pleadings raise issues of material fact that preclude entry of judgment in PECO's favor as a matter of law. Second, the Walnut Investors argue that PECO breached the implied covenant of good faith and fair dealing inherent in the LLC Agreement. I analyze these issues in that order.

---

[21] Answer ¶ 38.

**C.     The Pleadings Do Not Raise Material Issues of Fact that Would Preclude Entry of Judgment.**

According to the Walnut Investors, the pleadings raise material issues of fact falling into two categories. The first is whether the parties agreed to modify the LLC Agreement to afford the Rollover Investors the right to participate in the valuation process and to object to the valuation firm's determination. The second is whether certain provisions of the LLC Agreement governing the valuation methodology are ambiguous. For the reasons explained below, I conclude that neither category raises a genuine issue of material fact that would preclude entry of judgment on the pleadings.

### 1.     The LLC Agreement Was Not Modified

Upon the exercise of the Put Right, the LLC Agreement requires PECO to select a nationally recognized valuation firm to determine the fair market value of the preferred units in accordance with the valuation methodology set forth in the LLC Agreement. The LLC Agreement does not afford the Rollover Investors any right to participate in the selection of the valuation firm or in the valuation process itself after the valuation firm has been selected. Nor does the LLC Agreement afford the Rollover Investors any right to reject or challenge the valuation firm's determination. To the contrary, Section 9.2(b) of the LLC Agreement states explicitly that both the Company and the Rollover Investors "shall be bound by the determination" of the valuation firm. The LLC Agreement, moreover, provides no mechanism for judicial or any other form of review of that determination.

14

In an effort to obtain rights not afforded to them under the plain terms of the LLC Agreement in its original form, the Walnut Investors argue that the Company agreed to modify the LLC Agreement when the Rollover Investors exercised their Put Right to afford them the right to participate in the valuation process (*e.g.,* to provide information to and confer with the valuation firm about its determination) and to object to the valuation firm's determination.[22] The first hurdle to making this argument is Section 14.2 of the LLC Agreement, which states, in relevant part, that the LLC Agreement "may be amended, modified, or waived with the written consent of the Board . . . ." The Walnut Investors have not alleged, however, that the PECO board of managers ever consented in writing to modify the LLC Agreement, nor have they alleged any facts from which such a conclusion is reasonably inferable.

The Walnut Investors instead rely on well-settled Delaware law that contract provisions deeming oral modifications unenforceable can be waived by a course of conduct.[23] Specifically, they argue that the LLC Agreement was modified by virtue of

---

[22] During argument, the Walnut Investors recast their modification argument to assert that they exercised the Put Right "conditionally" or "contingently" on PECO agreeing to afford the Walnut Investors the right to participate in the valuation process and to object to the valuation firm's determination. *See* Tr. of Oral Arg. 32-35, 39. This argument cannot be squared with the plain text of the Put Notice, which states unconditionally that "each of the undersigned Rollover Investors hereby elects to require the Company and the Investor to purchase all of the Preferred Units held by such Rollover Investor." The text of the Reservation of Rights in the following paragraph of the Put Notice cannot reasonably be construed as imposing any condition on this unequivocal election.

[23] *See Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28 (Del. 1972). To prevail on such a theory requires proof by clear and convincing evidence. *Eureka VIII LLC v. Niagara Falls Holdings, LLC*, 899 A.2d 95, 109 (Del. Ch. 2006).

the inclusion of the Reservation of Rights in the Rollover Investors' Put Notice, which PECO accepted by its conduct when it proceeded with the valuation without expressing any objection to the Reservation of Rights. This argument is unavailing as a matter of law because there was no consideration to support the asserted modification.

"A modification of a contract requires consideration, *i.e.*, some benefit to the promisor or detriment to the promisee in exchange for the amendment."[24] But "[a] commitment to honor a pre-existing obligation works neither benefit nor detriment; therefore, a promise to fulfill a pre-existing duty, such as a promise to pay a debt owed, cannot support a binding contract because consideration for the promise is lacking."[25]

Here, the only action PECO took in response to the Put Notice was to engage a valuation firm to effectuate a purchase of the Rollover Investors' preferred units—something PECO already was obligated to do under Section 9.2(b) of the LLC Agreement.[26] That provision states explicitly that PECO "shall engage" at its own cost a

---

[24] *JBR Contractors, Inc. v. E & W, LLC*, 991 A.2d 18 (TABLE), 2010 WL 802076, at *1 n.4 (Del. Mar. 9, 2010).

[25] *James J. Gory Mech. Contracting, Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011) (internal citations omitted); *see also Roam-Tel P'rs v. AT&T Mobility Wireless Operations Hldgs. Inc.*, 2010 WL 5276991, at *6 (Del. Ch. Nov. 30, 2010) ("[A] promise to do what one is legally obligated to do … is not valid consideration.") (internal citations omitted) (Strine, V.C.).

[26] The Walnut Investors asserted for the first time during argument that PECO was not obligated to purchase the preferred units if the Put Right was exercised because of certain exceptions in Section 9.2(c) of the LLC Agreement. As counsel stated at argument, "9.2(c) says they can do basically whatever they want and take them or not take them." Tr. of Oral Arg. 35. I disagree. The exceptions in Section 9.2(c) are limited. They only apply when the Company would be prohibited by law from purchasing the units, would be financially incapable of doing so, or when the board determines that a repurchase

16

nationally recognized valuation firm "as promptly as practicable" following receipt of a written notice exercising a Put Right. Indeed, PECO would have been in breach of Section 9.2(b) if it had not engaged a valuation firm after receiving the Rollover Investors' Put Notice. Thus, the fact that PECO engaged Duff & Phelps in response to the Put Notice fails to demonstrate that PECO received new consideration or that it agreed to modify the LLC Agreement.

On the other side of the ledger, although the Walnut Investors claim they obtained new contractual rights, they do not identify any consideration they gave for those putative rights. That is because there was none. All the Walnut Investors did was "reserve" pre-existing rights they purported to (but did not) have with respect to the determination of value without giving up anything in return. In sum, there was no benefit to PECO, or detriment to the Walnut Investors, that can serve as the consideration necessary to support the alleged modification. Accordingly, I conclude as a matter of law from the face of the pleadings that the LLC Agreement was not modified to afford the Walnut Investors any right to participate in the valuation process or to object to the determination of value.

would be financially imprudent. None of these circumstances are pled to have applied when the Rollover Investors exercised the Put Right. Furthermore, even if the Company did not complete the repurchase, or only did so partially, The Pritzker Group, the Company's majority investor, would then be obligated to purchase (or to cause one of its affiliates to purchase) any preferred units not acquired by the Company to the extent The Pritzker Group (or its affiliates) was able to do so, and no argument has been made that they were not. LLC Agreement § 9.2(d). Thus, it is inaccurate to suggest that the LLC Agreement afforded PECO an open-ended option to refuse to repurchase the preferred units, or that someone (either PECO or The Pritzker Group and its affiliates) realistically would not have purchased the preferred units upon exercise of the Put Right in this case.

17

### 2. The Alleged Ambiguities in the LLC Agreement Are Irrelevant

The Walnut Investors' second theory for why the pleadings raise material issues of fact is based on alleged ambiguities in the valuation methodology in the LLC Agreement. According to the Walnut Investors, "[w]henever there was ambiguity or lack of clarity in the LLC Agreement with respect to the valuation methodology, Duff & Phelps took an approach that benefited PECO at the expense of the Rollover Investors."[27] The Walnut Investors criticize three specific decisions or assumptions Duff & Phelps made in applying the valuation formula: (1) deducting from its valuation long-term debt as of the valuation date, in particular $64 million of debt that was incurred in the second half of 2013 and the first five months of 2014; (2) using June 1, 2014 as the valuation date instead of December 31, 2013, which was the date for determining the EBITDA Collar; and (3) applying the EBIDTA Collar to the EBITDA of PECO Pallet, the operating subsidiary.

Regarding the first issue, the deduction of long-term debt, the LLC Agreement is not ambiguous in my view. The "Fair Market Value" of the preferred units is derived from "Total Equity Value," which is expressly defined to mean that the Company has satisfied and paid in full all of its obligations and liabilities:

> "Total Equity Value" means the aggregate proceeds which would be received by the Unitholders if: (i) all of the assets of the Company were sold at their fair market value to an unrelated third-party on arm's-length terms, with neither the seller nor the buyer being under compulsion to buy or sell such assets; (ii) *the Company satisfied and paid in full all of its obligations and liabilities* (including all Taxes, costs and expenses incurred

---

[27] Ans. Br. 8.

18

in connection with such transaction and any amounts reserved by the Board with respect to any contingent or other liabilities); and (iii) such net sale proceeds were then distributed in accordance with the distribution provisions of Section 4.1(b), all as determined by the Board.[28]

Given the breadth of the phrase "all of its obligations and liabilities" in the definition quoted above, the plain language of the LLC Agreement required that long-term debt obligations be subtracted from the value of Company's assets in order to determine the amount hypothetically available to distribute to the unitholders for purposes of determining the value of the Put Units.[29]

Regarding the second issue, the Walnut Investors argue that the valuation date should have been December 31, 2013 (the date used for applying the EBITDA Collar), and that the decision to use a June 1, 2014 valuation date increased the deduction for debt (thus decreasing the valuation) by an additional $14 million for debt that was incurred between January 1, 2014 and May 30, 2014.[30] The Walnut Investors point to no provision in the LLC Agreement mandating a December 31, 2013 valuation date. Although application of the EBITDA Collar required making certain EBITDA multiple

---

[28] LLC Agreement Art. I, at 15 (emphasis added).

[29] Although neither the Duff & Phelps report nor the parties' briefing clarifies whether the debt was incurred at the PECO or PECO Pallet level, it is ultimately inconsequential. Under Duff & Phelps' manner of calculating "Total Equity Value," the liabilities of both entities would be subtracted after applying the EBITDA Collar and before running the net amount through the waterfall in Section 4.1(b) of the LLC Agreement.

[30] The inclusion of this $14 million debt is alleged to have reduced the value to the Rollover Investors by over $1.46 million. (Verified Counterclaim ¶ 65).

calculations as of December 31, 2013,[31] the parties were free to pick whatever metric they wished to set upper and lower limits on the valuation of PECO's assets and to use a different date to determine the valuation of the preferred units.[32]

Article XIII of the LLC Agreement, which is entitled "Valuation," provides simply that the "Fair Market Value" of units shall be calculated "as of the date of valuation." The Put Notice was exercised on May 5, 2014. The Duff & Phelps report states as an "Assumption" that it selected a valuation date of June 1, 2014 "based on the latest financial information available to [it] at the commencement of [its] valuation work, which is information prepared as of May 2014." The choice of a June 1, 2014 valuation date thus was not irrational on its face. Indeed, the Walnut Investors concede the

---

[31] Specifically, as explained above, for purposes of determining the Put Price, the value of the assets of the Company "(i) may not be less than the product of (A) 6.5 multiplied by (B) the Company's 'EBITDA less Maintenance Capex' for the 12-month period ending on (1) December 31, 2013 with respect to the Rollover Put Units . . . and (ii) may not be more than the product of (A) 7.5 multiplied by (B) the Company's 'EBITDA less Maintenance Capex' for the 12-month period ending on (1) December 31, 2013 with respect to the Rollover Put Units . . . ." LLC Agreement § 9.2(b).

[32] *See, e.g.*, *Senior Housing*, 2013 WL 1955012, at *24 ("For example, if parties determined that a contractual payout would be determined in part by rainfall on a particular day in a particular location, they could stipulate that the rainfall would be as reported by the National Weather Service. In such a case, however arbitrary the input, the court could not second-guess the rainfall measurement of the National Weather Service by hearing expert testimony on how much rain actually fell in that particular location on that particular date. Rather, the contractual input would be respected as the ones chosen by the parties.")

20

selection of this date was reasonable, although "the lesser of the two reasonable explanations" in their view.[33]

Regarding the third issue, the parties agree it would have made no sense to construe the LLC Agreement literally to apply the EBITDA Collar to PECO, the parent company, when determining the value of the assets of PECO. As the Walnut Investors acknowledged in briefing, "[t]he literal application of the agreement's valuation collar to PECO would have reduced the Company's valuation to zero, which would have produced a meaningless valuation."[34] This is because PECO is a holding company that has no EBITDA of its own. PECO's only asset is its equity interest in PECO Pallet. Thus, it was rational for Duff & Phelps to apply the EBITDA Collar to the EBITDA of the operating subsidiary (PECO Pallet) to generate a positive value for the assets held by PECO (*i.e.*, its equity in PECO Pallet) and to avoid producing the absurd result of a zero valuation for PECO's assets.

To sum up, the Walnut Investors take issue with three aspects of Duff & Phelps' valuation determination. One aspect (deducting long-term debt) was consistent with the plain language of the LLC Agreement. The other two aspects (selecting June 1, 2014 as the valuation date and applying the EBITDA Collar to PECO Pallet) involved judgment calls to apply the valuation methodology in ways that were not specifically prescribed by the text of the LLC Agreement but were admittedly reasonable. Significantly, PECO, the

---

[33] Tr. of Oral Arg. 45-46; *see also id.* 51 ("And that's why December 31st is the more reasonable date to use for both.").

[34] Ans. Br. 10; *see also* Op. Br. 22-23.

Rollover Investors' counterparty to the LLC Agreement, did not make either of these judgment calls. They were made by Duff & Phelps, a third-party valuation firm selected in accordance with the procedures set forth in the LLC Agreement. Critically in that regard, both the Company and the Rollover Investors expressly agreed that they "shall be bound by the determination of the Valuation Firm . . . with respect to the Put Price as established by the Valuation Firm . . . ."[35] In other words, the LLC Agreement reflects a reciprocal arrangement whereby the buyer and seller of the preferred units were both bound to whatever determination a nationally recognized valuation firm made.

When parties to a contract agree to be bound by a contractually established valuation methodology, this Court will respect their right to order their affairs as they wish and refrain from second-guessing the substantive determination of value.[36] As then-Chancellor Strine explained in *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*, "[w]hen parties bargain to have a contractual payment turn on the valuation of property, the parties are free to set whatever level of judicial review they like."[37]

The Court in *Senior Housing* conceptualized three levels of review for valuation appraisals extending along a spectrum. First, the parties could agree to *de novo* judicial review, with the calculated valuation merely acting as a starting point for the reviewing

---

[35] LLC Agreement ¶ 9.2(b).

[36] *See, e.g.*, *JPMorgan Chase & Co. v. Am. Century Cos.*, 2012 WL 1524981, at *6 (Del. Ch. Apr. 26, 2012) (enforcing a provision of a contract providing that valuation would be "conclusive and binding on the parties for purposes of the applicable Option Exercise").

[37] 2013 WL 1955012, at *24 (Del. Ch. May 13, 2013).

court in case of a dispute. Second, as an intermediate level of review, the parties could choose to appoint an appraiser to determine a valuation, and designate that appraiser as an arbitrator should the parties disagree on the valuation, with review of the appraiser's decision limited to whatever statutory or private regime is chosen to govern the arbitration.[38] Third, the parties could agree to a regime in which the appraiser's valuation is final, thereby precluding judicial or any other form of review of the appraiser's substantive determination of value. The rationale for this final option is captured in a rhetorical question the Chancellor posed in *Senior Housing*: "When parties contractually decide to have a qualified expert with relevant credentials make a determination of value without any indication that the expert's judgment is subject to judicial review, on what basis would it make sense to infer that the parties intended to have a law-trained judge do a *de novo* review of the expert's determination?"[39]

---

[38] If the Federal Arbitration Act applied, for example, the grounds on which the arbitrator's decision could be set aside would be quite narrow, as such review "does not involve the court examining whether the arbitrator's legal judgments were correct or that its factual determinations were supported by substantial evidence." *Id. See also RBC Capital Mkts. Corp. v. Thomas Weisel P'rs, LLC*, 2010 WL 681669, at *8 (Del. Ch. Feb. 25, 2010) ("[U]nder the FAA, [arbitration] awards may be vacated only on limited grounds, such as where the award was procured by corruption or fraud, where the arbitrators were clearly partial or guilty of misconduct, or where the arbitrators exceeded their powers in granting the award."); *Julian v. Julian*, 2010 WL 1068192, at *11 (Del. Ch. Mar. 22, 2010) (parties agreed to dispute resolution mechanism "analogous to an arbitration" such that property appraisals "may only be discarded by the Court where there is evidence the appraisal is the product of fraud, bad faith, partiality or deception.").

[39] 2013 WL 1955012, at *25.

Although the role of the appraiser in *Senior Housing* was somewhat different than the role of the valuation firm in this case,[40] the third scenario identified in *Senior Housing* accurately describes the choice the parties to the contract made here. The LLC Agreement explicitly states that both parties agree to be bound by the valuation of the preferred units as determined by the valuation firm, and provides for no judicial, arbitral or other form of review of that valuation. Accordingly, in order to respect the contractual choice that the indisputably sophisticated parties made here, the Court must in my opinion refrain from second-guessing the substance of Duff & Phelps' valuation of the preferred units.

Given this framework, it becomes apparent that the Walnut Investors misconceive the level at which the Court may review the LLC Agreement for ambiguity. Although judgment on the pleadings for a contract claim ordinarily would be inappropriate when the contract is susceptible to more than one reasonable interpretation,[41] the relevant contractual provisions are not the ones setting forth the valuation methodology the valuation firm is supposed to apply to make its determination of value. Rather, the relevant provisions—as to which no argument of ambiguity has been advanced—are those delegating determinative authority to the valuation firm in the first place. Put

---

[40] In *Senior Housing*, property appraisals of senior housing facilities were used as inputs for determining certain payments (incentive distributions, asset management fees, and payments for membership interests) due under formulas set forth in the contract. Here, Duff & Phelps was tasked with making a final determination of value of the preferred units by applying a contractually prescribed valuation methodology.

[41] *See, e.g.*, *Gibraltar Private Bank & Trust Co. v. Boston Private Fin. Hldgs., Inc.*, 2011 WL 60000792, at *2 (Del. Ch. Nov. 30, 2011).

differently, that Duff & Phelps was required to make certain judgment calls in its application of the prescribed valuation methodology is irrelevant to deciding the present motion because the LLC Agreement unambiguously grants the valuation firm the sole authority to make the value determination, and unambiguously states that such determination is binding on all parties. Had the LLC Agreement provided for judicial review of disputes over that determination, questions about the reasonableness of Duff & Phelps' assumptions might be fair game. Because the parties contractually agreed that they both "shall be bound" by the valuation firm's determination and thus agreed to forego judicial review of that determination, however, the Court will not take mere allegations of ambiguity about the valuation methodology as an invitation to circumvent the structure of the deal to substitute its own judgment for that of the valuation firm.

This is not to say that the Rollover Investors are left without any legal protection. Even when parties to a contract agree to preclude judicial review of the substance of an appraiser's determination, they have a legitimate contractual expectation that the appraiser's determination was the product of a good faith, independent judgment. Thus, the Court may protect against conduct undertaken by a contractual party to taint or corrupt the contractually prescribed appraisal process. This form of review involves determining whether a party breached the implied covenant of good faith and fair dealing inherent in every contract governed by Delaware law. As the Court in *Senior Housing* explained:

> Even in this [third] scenario . . . it is not the case that a party bound by an appraiser's determination has no procedural protections. In such a scenario, it is a contractual expectation that the appraiser make a good faith,

25

independent judgment about value to set the contractual input. If one of the parties to the contract takes action to taint the appraisal process—for example, by providing the appraiser with false financial statements—a court can of course protect the injured party. Such judicial review would not, however, involve second-guessing the good faith judgment of the appraiser or examining the appraiser's valuation judgments for consistency with a judge's understanding of relevant corporate finance principles. It would instead involve a judge determining that a party had breached the contract's implied covenant of good faith and fair dealing, and that this breach, as its proximate result, deprived the appraiser's work of contractual integrity. Thus, judicial review is not unavailable, but is restricted to considering a claim that the appraisal is unworthy of respect because it does not, as a result of contractual wrongdoing, represent the genuine impartial judgment on value that the contract contemplates.[42]

\* \* \* \* \*

For the reasons explained above, I conclude that the parties to the LLC Agreement unambiguously agreed to be bound by the determination of value that Duff & Phelps made in response to the Walnut Investors' exercise of the Put Right, and thus that the Court is not free to second-guess the (admittedly reasonable) judgment calls Duff & Phelps made in applying the valuation methodology in the LLC Agreement to reach its determination. I also conclude that the parties did not modify the original provisions of the LLC Agreement to afford the Walnut Investors the right to participate in the valuation process or to object to the valuation firm's determination. Accordingly, I hold that the Walnut Investors' pleadings do not present any genuine issues of material fact that would preclude entry of judgment on the pleadings regarding the express terms of the LLC Agreement. In order to decide whether to enter judgment in PECO's favor, however, it

---

[42] *Senior Housing*, 2013 WL 195012, at \*26 (citation omitted).

26

remains necessary to determine whether the Walnut Investors have stated a claim for breach of the implied covenant of good faith and fair dealing. I turn to that issue next.

### D. The Walnut Investors Have Failed to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, "[i]n order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[43] "The implied covenant inheres to every contract, and is 'best understood as a way of implying terms in the agreement.' "[44] Terms will only be implied, however, "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[45] Moreover, "[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider . . . ."[46]

In their counterclaim, the Walnut Investors assert a single claim for breach of the implied covenant of good faith and fair dealing. As significant as what this claim focuses on, is what it does not allege. The Walnut Investors do not allege any facts suggesting

---

[43] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) (citation omitted).

[44] *Great-West Investors LP v. Thomas H. Lee Partners, L.P.*, 2011 WL 284992, at *14 (Del. Ch. Jan. 14, 2011) (quoting *E.I. duPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

[45] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (citation omitted).

[46] *Id.*

that Duff & Phelps is not a nationally recognized valuation firm (as required under the LLC Agreement) or that it was not independent. To the contrary, the Walnut Investors admit that the PECO board—with the participation and approval of their own general partner (Mayerson)—vetted each of the three valuation firms it considered for potential conflicts and unanimously authorized the Company's CFO to select between two of the firms, one of which was Duff & Phelps.[47] Nor do the Walnut Investors allege any facts demonstrating that PECO or its representatives took or refrained from taking any actions that tainted the process by which Duff & Phelps conducted the valuation of the preferred units once it was retained.[48] In other words, the Walnut Investors do not allege any of the kind of facts the Court in *Senior Housing* identified that would cast doubt on whether the valuation of the preferred units was the product of a "genuine impartial judgment on value."[49]

The Walnut Investors instead premise their implied covenant claim on essentially two theories. The first theory challenges the decision Duff & Phelps made to value the preferred units as of June 1, 2014, which, according to the Walnut Investors, was

---

[47] Answer ¶¶ 33-34.

[48] The Walnut Investors state in conclusory fashion in their brief that PECO "apparently convinced Duff & Phelps to skew the ambiguities [in the LLC Agreement] in favor of PECO." Ans. Br. 20. They fail to identify, however, any well-pled facts to support this theory.

[49] 2013 WL 1955012, at *26.

"unauthorized by the contract."[50] But it was not. As discussed above, Article XIII of the LLC Agreement simply required that the Fair Market Value (defined term) of the preferred units be determined "as of the date of valuation." Although the LLC Agreement did not prescribe a more precise date for the valuation, the decision to use June 1, 2014 as the valuation date was not "unauthorized" but instead was plainly reasonable given that the Put Notice was submitted on May 5, 2014, and the latest financial information available to Duff & Phelps was for May 2014. Indeed, as noted above, the Walnut Investors concede that the use of a June 1, 2014 valuation date was reasonable.[51] A decision to select one (even the lesser) of two admittedly reasonable options available under the LLC Agreement does not, by definition, constitute arbitrary or unreasonable conduct that has the effect of preventing a party to a contract from receiving the fruits of the bargain that was struck—especially when that decision was made by an independent third party, rather than the Walnut Investors' contractual counterparty.

---

[50] Ans. Br. 18. The Walnut Investors also assert, without explanation, that "[i]t was unreasonable and arbitrary to use a collar on EBITDA and not on debt." *Id.* It is not clear what this means. As explained above, the LLC Agreement prescribes a three-step process for determining the "Total Equity Value" of the Company, which involves (1) determining the fair market value of the Company's assets, (2) applying the EBITDA Collar to ensure that the value of the assets is at least 6.5 times but not more than 7.5 times the "Company's EBITDA less Maintenance Capex," and (3) then deducting from the result of steps 1 and 2, the amount of the Company's obligations and liabilities, which would include its debt obligations. *See* LLC Agreement Art. I, at 15. Thus, the EBITDA Collar is not supposed to be applied to debt of the Company.

[51] *See supra*. n.33.

The Walnut Investors' second theory focuses on business decisions the PECO board made before the Put Notice was delivered to the Company. According to the Walnut Investors, it was "unreasonable and arbitrary" for PECO to "pile on debt,"[52] apparently referring to $50 million in long-term debt that was incurred in the second half of 2013, and an additional $14 million in debt that was incurred during the first five months of 2014.[53] This conclusory allegation fails to state a claim for breach of the implied covenant of good faith and fair dealing.

As an initial matter, the essence of the claim is unsupported by any well-pled facts. In particular, the counterclaim is devoid of any facts from which it would be reasonable to infer that the debt in question did not serve a legitimate business purpose and was incurred for the bad-faith purpose of diminishing the valuation of the Put Units. Indeed, such an inference is contradicted by important admitted facts. It is admitted, for example, that the business of PECO, pallet pooling, requires significant capital investment when done on a large scale because pallets must be purchased, paid for, and stored to be available to customers.[54] As the Walnut Investors' counsel explained at argument:

> But if we go back, the very reason why PECO Pallet was acquired or bought by PECO Logistics was why? Well, we want to go national, and we need a bunch of money to do that. Because we've got to buy a lot of pallets

---

[52] Ans. Br. 18.

[53] *See id.* at 8.

[54] Answer ¶ 17.

because we could need them anywhere at any time, and so we need to put on a lot of debt. Everybody understood that.[55]

The Walnut Investors further admit they received the Company's 2013 unaudited financials in February 2014, and were aware of the Company's debt situation as of the end of 2013 when they exercised the Put Right.[56] As to the $14 million in debt that was incurred in the first five months of 2014, it was Duff & Phelps—not PECO—that made the admittedly reasonable decision to value the preferred units as of June 1, 2014, thereby causing this debt to be taken into account in the valuation process. Given the lack of any well-pled facts demonstrating that PECO incurred the debt in question for an improper, bad-faith purpose, and given the admitted facts to the contrary, the Walnut Investors' second implied covenant theory fails to state a claim for relief.

\* \* \* \* \*

In summary, on the basis of the pleadings, I find that PECO responded to the Walnut Investors' exercise of their Put Right appropriately according to the terms of the LLC Agreement. Upon receipt of the Put Notice, PECO promptly selected Duff & Phelps—a concededly nationally recognized valuation firm—to value the Put Units. It did so through a vote of its board, which included a representative from the Walnut Investors who approved the process by which PECO sought and selected a valuation firm. Once PECO received Duff & Phelps' valuation, which both it and the Walnut

---

[55] Tr. of Oral Arg. 45; *see also id.* at 51 ("Putting debt into this was exactly what they should have been doing. That's the whole reason for the whole enterprise here.").

[56] Answer ¶ 30; Tr. of Oral Arg. 50.

Investors were contractually bound to accept, PECO promptly sought to repurchase the Put Units.

The Walnut Investors have not pled any facts, nor have they disputed any facts pled by PECO, such as would render entry of judgment on the pleadings inappropriate. They have not challenged the independence of Duff & Phelps, nor have they alleged any facts demonstrating that PECO took any action to taint or undermine the valuation process so as to sustain a claim for breach of the implied covenant of good faith and fair dealing. Finally, the Walnut Investors' arguments that the LLC Agreement was modified, or that it was ambiguous in any relevant respect, both fail as a matter of law. Accordingly, PECO is entitled to the declaratory relief that it seeks.

## IV. CONCLUSION

For the foregoing reasons, PECO's motion for judgment on the pleadings of its affirmative claims and to dismiss the counterclaim for failure to state a claim for relief is granted. An implementing order accompanies this opinion.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PECO LOGISTICS, LLC,                          )
                                              )
    Plaintiff/Counterclaim                )
    Defendant,                            )
                                              )
    v.                                    )    C.A. No. 9978-CB
                                              )
WALNUT INVESTMENT PARTNERS, L.P., and         )
WALNUT PRIVATE EQUITY FUND, L.P.,             )
                                              )
    Defendants/Counterclaim               )
    Plaintiffs.                           )
                                              )

## FINAL JUDGMENT

IT IS HEREBY ORDERED this 30th day of December, 2015, for the reasons stated in the Court's Memorandum Opinion of today's date, that:

1.    Defined terms have the meaning set forth in the Memorandum Opinion.

2.    Judgment is entered in favor of PECO and against the Walnut Investors on Counts I and II of PECO's Amended Verified Complaint.

3.    The Court declares that PECO fully complied with the terms of the LLC Agreement in valuing the Put Units, and that the Walnut Investors are bound by Duff & Phelps' determination of the value of the Put Units.

4.    The Walnut Investors' counterclaim is dismissed with prejudice.

 

_____
Chancellor